[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 22, 2012
JOHN LEY
CLERK

No. 10-15406

D.C. Docket No. 2:08-cv-14201-DLG

UNITED STATES OF AMERICA, ex rel.,

Plaintiff

LUCAS MATHENY,
DEBORAH LOVELAND,

Plaintiffs–Appellants,

versus

MEDCO HEALTH SOLUTIONS, INC.,
POLYMEDICA CORPORATION,
LIBERTY HEALTHCARE GROUP, INC.,
LIBERTY MEDICAL SUPPLY, INC.,
LIBERTY COMMERCIAL HEALTH SERVICES CORP., et al.,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Florida

(February 22, 2012)

Before WILSON and FAY, Circuit Judges, and RESTANI,[*] Judge.

RESTANI, Judge:

Appellants Lucas W. Matheny ("Matheny") and Deborah Loveland ("Loveland") (collectively "Relators") appeal the decision of the United States District Court for the Southern District of Florida dismissing with prejudice Relators' Third Amended Complaint for failure to state a claim upon which relief may be granted. The district court held that Relators failed to allege with particularity, as required by Federal Rule of Civil Procedure 9(b), that the Defendants knowingly made a false statement for the purpose of concealing or avoiding an obligation to pay money to the government. For the following reasons, we reverse and hold Counts I and II of Realtors' Third Amended Complaint are sufficient to survive a motion to dismiss for failure to state a claim.[1]

## BACKGROUND

Relators Lucas Matheny and Deborah Loveland brought a qui tam action[2]

---

[*] Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

[1] The Third Amended Complaint also alleges a Count III, which was dismissed by the district court for failure to state a claim. Relators do not appeal the dismissal of Count III.

[2] A qui tam action permits an private individual, known as a relator, to bring an action on their own and the government's behalf. Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 565 n.2 (11th Cir. 1994) (per curiam). The complaint is first filed under seal to allow the government time to investigate and intervene. 31 U.S.C. § 3730(b). If the government declines to intervene, the relator may continue with the action, id. § 3730(c)(3), and if successful,

2

against defendant Medco Health Solutions, Inc. ("Medco") and its subsidiaries, alleging violations of the reverse false claim provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(7) (2006) (amended 2009).[3]  The subsidiary defendants include PolyMedica Corporation ("PolyMedica"), Liberty Healthcare Group, Inc. ("LHG"), and Liberty Medical Supply, Inc. ("LMS").[4]  Two corporate executives of LMS were also named as defendants, Arlene Perazella, the Executive Vice President of Operations, and Carl Dolan, the Vice President of Special Projects and Compliance.

We account the facts as alleged in the Third Amended Complaint ("Complaint").  Relator Matheny was employed as a Report Analyst, Accounts Receivable Manager, Project Manager, and eventually Cash Management Manager by defendant LMS.  Relator Loveland was employed as Accounting Manager,

---

may recover between 25 and 30 percent of the judgment or settlement, plus reasonable expenses, attorney fees, and costs, id. § 3730(d)(2).  An FCA violator is also subject to statutory penalties of between $5,000 and $10,000 per claim and treble damages.  Id. § 3729(a).

[3]  Relator Matheny first filed a complaint in June 2008.  The complaint was subsequently amended to include Relator Loveland.  The United States declined to intervene and the district court unsealed what was then the Second Amended Complaint.  Defendants moved to dismiss the Second Amended Complaint for failure to state a claim, which was granted by the district court without prejudice.  Relators filed the Third Amended Complaint in July 2010, which the district court dismissed with prejudice and is the subject of this appeal.

[4]  The remaining subsidiary defendants are Liberty Commercial Health Services Corp., Liberty Direct Services Corp., and Liberty Medical Supply Pharmacy, Inc.  All corporate and individual defendants are referred to herein as "Defendants."

Director, Assistant Controller, and Controller by LMS and LHG. All of the corporate and individual Defendants were subject to a Corporate Integrity Agreement ("CIA"), which the parent company PolyMedica entered into with the Office of the Inspector General of the U.S. Department of Health and Human Services in November 2004.[5] The CIA required the Defendants to remit payments from the government that lacked sufficient documentation and payments received in duplicate or in error. The CIA defined these excess or unidentified payments as "Overpayments." The CIA required the Defendants to return to the government all Overpayments within thirty days of identification with the use of an "Overpayment Refund Payment Form."

During their time as employees, Relators became aware of a scheme by their supervisors to conceal approximately $69 million dollars in Overpayments that, under the CIA, should have been remitted to the government. Relators first learned of Overpayments in an April 2006 meeting attended by Relator Matheny and Defendants Perazella and Dolan. At this meeting, PolyMedica's Compliance Officer Alana Sullivan informed the Defendants that the Overpayments identified

---

[5] Defendant Medco, the parent company of PolyMedica, is also subject to a corporate integrity agreement, which contains standards more stringent than those contained in PolyMedica's CIA. At oral argument, Relators clarified that all the corporate Defendants shared the same billing department, and thus, all corporate defendants had knowledge of the fraudulent conduct.

at the meeting needed to be refunded to the government. Despite the identification of Overpayments, Perazella and Dolan stated in the April 2006 meeting that the Defendants would not repay the Overpayments because they lacked the manpower to do so.

The Overpayments were never refunded and instead remained in the Defendants' possession through April 2008. By March 2008, Defendants Perazella and Dolan had identified over $62 million in Overpayments resulting from the lack of documentation and $7 million in Overpayments due to duplicate billings, billings in error, or some other error. Under the direction of Perazella and Dolan, Defendants developed a scheme by which the Overpayments were transferred to unrelated patient accounts, fictitious patient accounts, or eliminated from the records through a computer program called a "datafix." Relator Matheny reported the datafix scheme to PolyMedica's Compliance Officer Kim Ramey and was later told by the Assistant Vice President of Compliance that the datafix scheme was appropriate and had been approved by PolyMedica's Chief Operating Officer. Relator Matheny worked with other employees to perform the datafix.

PolyMedica's Compliance Officer Kim Ramey, despite knowledge of the scheme to retain and conceal the Overpayments in violation of the CIA, certified in a 2008 report to the government that the Defendants had complied with all CIA

requirements (the "Certification of Compliance"). Count I alleges that the 2008 Certification of Compliance was false due to the failure to report or remit the millions of dollars in identified Overpayments, and that the Defendants made and used the Certification to conceal and avoid the obligation to remit Overpayments.

Count II involves the same obligation to remit Overpayments within thirty days but is based on a separate scheme and separate false records. In addition to a certification of compliance, the CIA required the Defendants to submit annually a random sample of patient accounts (the "Discovery Sample") to the Office of Inspector General/Independent Review Organization ("IRO"). The IRO would then review the patient accounts in the Discovery Sample to determine whether all CIA requirements had been satisfied. If the IRO review resulted in an error rate of above 5%, the IRO would initiate an audit of all patient accounts.

Instead of supplying a Discovery Sample of random patient accounts as required, Defendants removed accounts that contained Overpayments, generated multiple samples, and then removed all remaining evidence of the Overpayments from these samples until a perfect sample was created. As a result, the Discovery Sample passed the annual IRO review in 2005 through 2008 with a 0% error rate and the Defendants avoided a full audit, which would have revealed the unresolved Overpayments. Relator Matheny personally participated in the

6

manipulation of the Discovery Sample. Count II alleges the Defendants made and

used these false Discovery Samples to conceal the obligation to remit

Overpayments within thirty days of identification.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction to review a final order of the district court under 28

U.S.C. § 1291.[6] We review de novo a dismissal for failure to state a claim upon

which relief may be granted. Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th

Cir. 2005) (per curiam) (citing United States ex rel. Clausen v. Lab. Corp. of Am.,

Inc., 290 F.3d 1301, 1307 n.11 (11th Cir. 2002)). We accept as true the facts

alleged in the complaint and construe the facts in the light most favorable to the

plaintiff. Corsello, 428 F.3d at 1012; White v. Lemacks, 183 F.3d 1253, 1255

(11th Cir. 1999).

**DISCUSSION**

The False Claims Act ("FCA") imposes liability on any person who

"knowingly makes, uses, or causes to be made or used, a false record or statement

to conceal, avoid, or decrease an obligation to pay or transmit money or property

to the Government[.]" 31 U.S.C. § 3729(a)(7).[7] This is known as the "reverse

---

[6] The district court had jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

[7] In 2009, Congress amended and renumbered sections of the FCA. Fraud Enforcement
(continued...)

7

false claim" provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim. See United States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1235–36 (11th Cir. 1999). The purpose of the FCA is to encourage private citizens who are aware of fraud against the government to expose the fraud, while preventing opportunistic suits by individuals who hear of fraud publicly but play no part in exposing it. Cooper, 19 F.3d at 565.

To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation. See 31 U.S.C. § 3729(a)(7); see also United States v. Bourseau, 531 F.3d 1159, 1164–70 (9th Cir. 2008).

At the pleading stage, a complaint alleging violations of the FCA must satisfy two pleading requirements. First, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.

---

[7](...continued)
& Recovery Act of 2009, § 4(a), Pub. L. No. 111–21, 123 Stat. 1617, 1621–22 (2009). These amendments do not apply to this case. See id. § 4(f), 123 Stat. at 1625. Citations herein refer to the FCA without the 2009 amendments.

8

Civ. P. 8(a)(2). A complaint cannot merely recite the elements of a cause of action but must contain factual allegations sufficient to raise the right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Second, a complaint must comply with Rule 9(b)'s heightened pleading standard, which requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); Clausen, 290 F.3d at 1308–09 (holding Rule 9(b) applies to FCA claims). The purpose of Rule 9(b) is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges . . . ." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (citation and internal quotation marks omitted).

The particularity requirement of Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation marks omitted) (citing Clausen, 290 F.3d at 1310)); see also Ziemba, 256 F.3d at 1202 (noting the pleading standards are satisfied if alleging precisely what statements were made in what documents, when, where and by whom, the content, the manner in which they misled the plaintiff, and what the defendants obtained as a consequence of the

fraud). We address first the issues common to Count I and II and then turn to each count individually.

## I. Issues Common to Counts I and II

### A. Obligation

The district court dismissed Counts I and II for failure to establish the existence of an obligation that was knowingly unpaid.[8] Defendants do not challenge the existence of an obligation, only whether that obligation was violated, which we discuss below. We conclude Relators have adequately alleged with particularity the existence of an obligation to pay money to the government.

To sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements. See Pemco, 195 F.3d at 1236–37. An express contractual obligation to remit excess government property is a definite and clear obligation for FCA purposes.[9] See id. at 1238 (holding a "written contract which

---

[8] The district court does not state whether it evaluated the existence of an obligation under Rule 8 or 9. Because we conclude Relators have pled the existence of an obligation with particularity, we do not decide which pleading standard applies.

[9] Although not applicable to this case, we note that Congress recently amended the FCA to define "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" Fraud Enforcement & Recovery Act of 2009, § 4(b)(3), 123 Stat. at 1623. This amendment was not retroactive, and thus, this definition does not apply here. See id. § 4(f), 123 Stat. at 1625.

expressly obligated [defendant] to be responsible and accountable for the government property in its possession and to return that property . . . in accordance with the government's instructions" a sufficient obligation).

Here, the Complaint contains detailed allegations relating to the Defendants' contractual obligation to identify, report, and remit excess government money in accordance with the CIA's instructions. Specifically, Relators allege that the CIA obligated Defendants to report and remit all Overpayments within thirty days of identification through the use of the Overpayment Refund Payment Form. This allegation is supported by the terms of the CIA, which state that "[i]f at any time, PolyMedica identifies or learns of any Overpayment, PolyMedica shall notify the payor . . . within 30 days after identification of the Overpayment . . . . PolyMedica shall repay the Overpayment to the appropriate payor . . . ."[10] The CIA defines Overpayments as "the amount of money PolyMedica has received in excess of the amount due and payable under any Federal health care program requirements." The Complaint explains that money is not "due and payable" if PolyMedica lacks the necessary documentation to match that money to a specific patient account. Without the necessary

---

[10] The CIA and account spreadsheets are attached to the Complaint as exhibits, and thus, we may consider them here. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

11

documentation, the entire payment received is an Overpayment that must be repaid. The Complaint outlines the procedures set by the CIA which Defendants must use to remit any identified Overpayments. Under these procedures Overpayments must be remitted with an Overpayment Refund Payment Form within thirty days of identification. The Overpayment Refund Payment Form requires PolyMedica to specify a reason for the Overpayment such as duplicate, billed in error, or insufficient documentation. Thus, Relators have alleged an express contractual obligation on behalf of the Defendants to remit Overpayments within thirty days of identification and defined that obligation in detail with references to particular contract sections. These factual allegations are sufficient to plead with particularity the existence of an obligation to pay money to the government.

### B. Knowingly

The district court found that Relators had failed to allege that the Defendants knowingly submitted a false Certification of Compliance. The Defendants do not specifically address Relators' challenge in this regard. We conclude the Complaint adequately alleges that the Certification of Compliance and the Discovery Sample were knowingly false.

The FCA imposes liability if the defendant knowingly "makes, uses, or

causes to be made or used, a false record or statement . . . ."[11]  31 U.S.C. § 3729(a)(7).  At the pleading stage, "knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Here, Relators allege that Defendants Perazella and Dolan "willfully and knowingly devised a scheme to create <u>false records</u> to eliminate the cash overpayments."  Additionally, Relators allege Compliance Officer Kim Ramey was fully aware of the mismanagement of Overpayments and the use of the datafix in violation of the CIA, but nevertheless certified that the Defendants were in compliance with all CIA requirements.  On Count II, Relators allege "[t]he creation of multiple random Discovery Sample lists was an intentional and knowing attempt" by the Defendants to make a false record and avoid an obligation to the government.  Under Rule 9(b)'s standards, these general allegations are sufficient.

## II.   Count I:  False Certification of Compliance

In order to state a cause of action, a FCA relator must allege: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or caused to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to

---

[11]  The FCA defines "knowingly" as when a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ."  31 U.S.C. § 3729(b).

the government, and; (5) the materiality of the misrepresentation.  See 31 U.S.C. § 3729(a)(7); see also Bourseau, 531 F.3d at 1164–70.  Here, the remaining elements at issue are whether there was a Certification of Compliance, and if so, whether it was false and material.

### A.      Existence and Submission of the Certification of Compliance

The district court found Relators failed to allege a basis of knowledge of the contents of the Defendants' Certification of Compliance.  The Defendants argue this basis of knowledge must be personal knowledge of the actual certification or its submission and that only employees in the compliance department could obtain such knowledge.  According to Defendants, without such knowledge, the allegation that a Certification of Compliance actually existed or was submitted is conclusory.  We conclude the Complaint alleges with particularity the actual existence and submission of the Certification and thus, is not conclusory.[12]

In order to plead the submission of a false claim with particularity, a relator

---

[12]  We note that for a reverse false claim action, presentment of a false claim is not at issue and presentment of a false statement is not required by the statute and thus, does not need to be pled.  See 31 U.S.C. § 3729(a)(7); c.f. Hopper, 588 F.3d at 1327 (holding the absence of a presentment clause in § 3729(a)(2) means relators do not have to plead the actual presentment of a false claim).  When the false statement is alleged to be a Certification of Compliance, however, submission to the government may be one way to demonstrate how the Certification was material to the concealment of an obligation.  Thus, we will consider whether the Certification was submitted to the government, not, as Defendants allege, because our precedent requires it, but because submission may be necessary to demonstrate materiality.  See Neder v. United States, 527 US 1, 16 (1999) (defining materiality as having the "natural tendency to influence . . . the decisionmaking body to which it was addressed") (citations omitted).

must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result. See Hopper, 588 F.3d at 1324 (citing Clausen, 290 F.3d at 1310). Here, the Complaint contains factual allegations relating directly to the submission of the Certification of Compliance. Relators state exactly which documents (the annual report of 2008), exactly which sentence and its substance ("PolyMedica is in compliance with all of the requirements of this CIA"), who was responsible (Compliance Officer Kim Ramey under the direction of Defendants Dolan and Perazella), when the Certification was submitted (2008 reporting period), how the statement misled the government (false assurance of compliance), and what the Defendants gained as a result ($69 million).

This is not a case like Clausen and its progeny, in which the complaint failed to allege any factual specifics identifying the existence or submission of an actual claim. See e.g., Corsello, 428 F.3d at 1013–14 (holding complaint failed to satisfy Rule 9 when it failed to allege the who, what, when, where, and how of the fraudulent submissions); United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358 (11th Cir. 2006) (holding complaint failed to allege with particularity the actual submission of a false claim); Clausen, 290 F.3d at 1312 (holding relator's failure to allege if or when any actual improper claims were submitted was fatal to

15

complaint). Here, Relators pled specifics relating to the submission of a specific statement in a specific document, submitted by a specific person during a specific review, as required by a particular government contract. Because these allegations are well-pled, we may accept them as true and conclude that a Certification was actually submitted. Relators do not need to further support their well-pled factual allegations with some other "factual basis," such as personal knowledge of the submission or employment in the compliance department. See Clausen, 290 F.3d at 1312–14 (noting corporate outsiders may have a harder time gathering the factual specifics necessary to plead a claim but noting the same pleading standard applies regardless of the relator's status).

Even if Relators did need to allege some level of personal knowledge or insider status, they have done so. In addition to Relator Matheny's involvement in the April 2006 meeting in which Overpayments were identified, Relator Matheny alleges subsequent involvement in the discussions and operation of the datafix. For example, in a meeting on April 21, 2008, Compliance Officer Kim Ramey allegedly asked Relator Matheny what happened to all of the unbatched cash and Relator Matheny reported the datafix scheme. Relator Matheny also met with Assistance Vice President of Compliance Nancy Gregory on or about April 23, 2008 to discuss the use of the datafix and cash Overpayments. These allegations

16

demonstrate that Relator Matheny, despite not technically a member of the compliance department, was involved and personally aware of the process he now claims to be fraudulent. Personal involvement with the funds, direct conversations with Defendants regarding the Overpayments, and personal knowledge of the account procedures and CIA requirements further support Relators' allegations. See United States ex rel. Walker v. R&F Properties of Lake Cnty. Inc., 433 F.3d 1349, 1360 (11th Cir. 2005) (noting that allegations of personal knowledge resulting from employment and conversations with billing employees can provide support to a FCA complaint). Thus, Relators established the existence and submission of a Certification of Compliance by Defendants. We now turn to whether this Certification was false.

## B. False Statement

In order to establish that the Certification of Compliance was a false statement, Relators must allege with particularity how Defendants violated the CIA. The district court held and the Defendants argue that the Complaint failed to allege a factual basis to show that the funds identified in the Complaint were actually Overpayments.[13] We conclude Relators have pled with particularity the

_____

[13] The district court found the failure to show the obligation was not repaid was fatal to the Complaint. In order to show the Certification of Compliance was false, Relators must allege that at the time of Certification the CIA had been violated, regardless of whether it was later

(continued...)

17

existence of Overpayments that were not repaid according to the CIA instructions and thus, have established a violation of the CIA.

In order to plead with particularity, Relators must allege the time, place, and substance of the Defendants' violation of the CIA, specifically, the details of the what constituted the violation, when it occurred, and who engaged in it. See Hopper, 588 F.3d at 1324. Here, Relators allege that in April 2006 and again in March 2008, Defendants Perazella and Dolan identified $62 million in Overpayments resulting from insufficient documentation and $7 million in Overpayments resulting from duplicate billings or other errors. These Overpayments remained in the Defendants' accounts for more than thirty days until Defendants eliminated the Overpayments from their records, or applied the Overpayments to fictitious patient accounts or unrelated patient accounts. Because the CIA required Defendants to remit all Overpayments within thirty days of identification, and the identified Overpayments remained in the Defendants' accounts for two years, the Complaint alleges that the Defendants did not comply with the CIA requirements.

---

[13](...continued)
repaid. Moreover, Relators allege the obligation was not merely to remit Overpayments, but to do so within thirty days of identification with the Overpayment Request Form. The failure to use that process within the thirty day deadline is itself a violation of the CIA, regardless of whether Overpayments were eventually repaid. Thus, whether the Defendants violated the CIA does not turn on repayment of the Overpayments.

Relators supply particularized facts to support these allegations. Relators allege the date of the meeting in which Overpayments were identified, specify the employees in attendance by name and title, and identify some of the accounts discussed in the meeting by account number and amount. Attached as exhibits to the Compliant are several spreadsheet identifying the accounts discussed at the April 2006 meeting by patient or account number, the Medicare or Medicaid claim invoice number or reimbursement check number, the line item number of the invoice, the carrier, fiscal intermediary or insurance company code, the amount of Overpayment, and how long the Overpayment remained in each patient account. Although the Complaint's exhibits include details on only a portion of the accounts alleged to contain Overpayments, the inclusion of some records for some of the accounts is sufficient. Atkins, 470 F.3d at 1358–59 (noting that while dates, amounts, and account numbers can provide particularity, Rule 9(b) does not mandate all of that information for each alleged claim, only "some of the information for at least some of the claims") (quoting Clausen, 290 F.3d at 1312 n.21).

Relators further support their allegation of the existence of Overpayments with personal knowledge of the identification. Relator Matheny alleges he was present at the meeting when the accounts were identified by a Compliance Officer

19

as Overpayments. He also alleges that he discussed the existence of Overpayments with Compliance Officer Ramey and the appropriateness of the datafix scheme. Such conversations and direct knowledge relating to how the Defendants identified Overpayments further supports Relators allegations. See Clausen, 290 F.3d at 1306 (searching the complaint for allegations of billing practices or second-hand information about billing practices); see also Walker, 433 F.3d at 1360 (holding at least one personal discussion regarding defendants billing practices and being told how the defendants bill the government sufficient to support an allegation of a fraudulent claim). Here, Relator Matheny's personal knowledge and discussions relating to how, when, and who identified the existence of Overpayments lends support to the allegation that Overpayments existed, were identified by the defendants, and can be found in the attached accounts. Thus, Relators' allegations are particular because they establish exactly how the Defendants violated the CIA, including when the violations occurred, who directed and performed the violations, how and which accounts were affected, and what the Defendants gained as a result.

Defendants argue these allegations fail to satisfy the particularity requirement because the Complaint does not show the funds identified in the Complaint were received from federal payors or that they were in excess of the

amount due and payable to Defendants. Contrary to Defendants' first argument, the Complaint contains detailed allegations that the Overpayments were received from Medicare, Medicaid, or other federally funded healthcare programs. The Complaint specifies the Medicare or Medicaid invoice number or reimbursement check and the "carrier, fiscal intermediary and/or insurance company code" for accounts alleged to contain Overpayments. The exhibits also identify the Medicare or Medicaid claim invoice number for the claim originally submitted to the government or the government reimbursement check number. By providing the specific amount, invoice number, and carrier code, the Relators have alleged the existence of federal funds with particularity.

Defendants' second argument, relating to the definition of "due and payable," is equally without merit. The Complaint alleges $62 million in Overpayments resulted from the lack of sufficient documentation to match the payments to specific patient accounts. As described above, Relators allege in detail, and with support of the CIA, how amounts not "due or payable" include payments for which Defendants cannot provide sufficient documentation to match the payment to a patient. Relators support their allegations with exhibits that identify the specific fictitious patient account numbers used to hold the unmatched payments. The exhibits also show accounts that have positive balances after all

21

debits, credits, and payments, which suggest the government paid Defendants more than Defendants requested to cover the cost of the particular patient. Although Defendants dispute the interpretation of the CIA to include payments that lack sufficient documentation, such an argument goes to the merits of the case and does not affect the sufficiency of the Complaint's allegations at the pleading stage.[14]

Relators have therefore pled with particularity that Defendants identified Overpayments but failed to report or remit the funds as the CIA required. Because Relators have established a violation of the CIA, the Certification of Compliance submitted by Defendants constituted a false statement. We now turn to whether

---

[14] Defendants argue Relators' definition of Overpayments to include payments with insufficient documentation is based on CIA provisions taken out context. Specifically, Defendants argue the definition relied on by Relators applies only for purposes of the annual "Claims Review" and if such a definition applied to Overpayments in other situations, a definition for only this purpose would not be needed. We cannot and do not conclude whether Defendants have a viable defense to Relators' allegations based on the interpretation of the CIA. At the pleading stage, we are limited to concluding whether Relators' Complaint alleges a plausible claim for relief that has been pled with particularity. In addition to the definition disputed by Defendants, Relators allege that the Overpayment Refund Form required Defendants to specify why the refunded money was an Overpayment and that one of the available definitions was "insufficient documentation." Relators also allege that federal law prohibits Defendants from transferring payments designated for one patient to a different patient account. It seems plausible that if the Defendants lacked the documentation necessary to determine to which patient the payment applied, the payment was not "due and payable" because the Defendants could not apply that payment to the correct patient account. Moreover, even if the definition of Overpayments does not include payments with insufficient documentation, Relators allege that $7 million in Overpayments resulted from duplicate billings or payments billed in error. Thus, even if Defendant's interpretation of the CIA is correct, this merely decreases the damage to the government and does not destroy Relators' plausible claim for relief.

that Certification of Compliance had a material affect on the government's decision-making.

## C.     Material

The district court held Relators failed to show how the Defendants used or caused to be used, the Certification of Compliance to conceal, avoid, or decrease an obligation to the government.[15]  Defendants do not specifically address Relators' challenge in this regard.  We hold that because the CIA required the Defendants to provide an accurate account of any excess government property in the Defendants' possession, and the Certification of Compliance misrepresented the value of the property in the Defendants' possession, the submission of the Certification played a material role in the concealment and avoidance of an obligation.

To be material, a misrepresentation must have the ability to influence the government's decision-making.  See Neder, 527 U.S. at 16 (defining materiality as

---

[15]  The FCA requires a showing that the defendants "makes, uses, or cause to be made or used" a false statement with the purpose to conceal an obligation.  31 U.S.C. § 3729(a)(7).  In Astra, on which the district court based its conclusion, it was undisputed that the defendants did not make the certifications, and thus, relators needed to show that the defendants "used" the certifications.  United States ex rel. Cullins v. Astra, Inc., 2010 WL 625279, at *6 (S.D. Fla. 2010).  To the extent the district court found the Complaint did not allege the Defendants "make, use, or cause to be made or used" a Certification of Compliance, we refer to our above discussion which concluded Relators adequately pled the existence and submission of a Certification.  To the extent the district court concluded Relators failed to show how the Certification played a role in the concealment of the obligation, we characterize the issue as materiality of the misrepresentation and refer to the following discussion.

23

having the "natural tendency to influence . . . the decisionmaking body to which it was addressed"). When the government relies on the defendant to identify and report the value of government property in the defendant's possession, and the defendant misrepresents the value of that property, the misrepresentation is material. See Pemco, 195 F.3d at 1235 (holding complaint alleged the required elements of a reverse false claim cause of action). In Pemco, the defendant's contract required the defendant "upon determining that it possessed excess government property . . . [to identify] the excess property and to dispose of that property in accordance with the government's instructions." Id. at 1237. The defendant corporation in Pemco identified excess government aircraft wings in its possession but mis-reported to the government the type of aircraft wing. Id. at 1236. As a result, the government agreed to sell the excess property to the defendants at a significant discount. Id. at 1236–37.

Here, Relators have similarly alleged a contractual arrangement whereby the government relies on the Defendants to identify and report excess government property in the Defendants' possession. Once the Defendants identified excess payments, they had the obligation to report and remit the full value according to the CIA instructions. Although the Defendants identified Overpayments as early as April 2006 and continued to identify millions of dollars in Overpayments

24

through 2008, the Defendants assured the government, through the Certification, that they did not possess any unreported Overpayments. By certifying that they did not owe the government any additional money, the Defendants concealed the true value of the government property in its possession. We conclude the misrepresentation was material because, as a result of the Certification of Compliance, the government was unable to identify and recover excess government payments. Thus, Relators have sufficiently pled each element of a reverse false claim for the Certification of Compliance and the district court's dismissal of Count I is reversed.

## III. Count II: False Discovery Sample

The district court does not explicitly address Count II, but seems to have dismissed it for failure to establish the existence of an obligation that was not repaid.

Defendants argue the dismissal of Count II should be affirmed because the Complaint does not plead with particularity that a Discovery Sample was actually submitted. Specifically, Defendants argue the Complaint does not allege when such samples were submitted, to whom they were submitted, who submitted them, or what exactly the submission contained. Defendants argue Relator Matheny's personal involvement is insufficient to support his allegations because he could

25

have been working on the creation of a sample for Defendants' internal use only and not for submission to the government. Because we concluded above that Relators adequately alleged an obligation, we address only the Defendants' argument.

Here, the Complaint alleges that the Defendants made a false Discovery Sample in October of 2005, 2006, 2007, and 2008. The Complaint alleges that the Defendants submitted the Discovery Samples to the IRO auditor during the annual review in November of the same years. The Complaint alleges in detail who made the Discovery Samples (LMS Business Analyst employee Bob Swiatek), who approved and directed the process (Defendants Perazella and Dolan), and how various employees, including Relator Matheny, altered the patient accounts to produce a false Discovery Sample. Thus, the Complaint alleges what statement was false (the Discovery Sample), in what documents (the annual review documents), when it was submitted (between October and November of each year), to whom it was submitted (IRO auditor), what the statement did and did not contain (Paid Claims with no evidence of Overpayments), who approved the process, and who was responsible for developing the Discovery Samples. The Complaint does not however, specify by name or title the person who actually pushed the send button and transmitted the Discovery Sample to the IRO auditor.

We do not conclude the exclusion of this detail is fatal to Relators' Complaint.

As Defendants recognize, we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct. See Walker, 433 F.3d at 1360 (holding discussions with billing employee regarding the fraudulent practices and participation in the process that led to false claims sufficient to satisfy Rule 9(b)). Relator Matheny alleges personal involvement in not only the process that lead to a false Discovery Sample, but the creation of the actual Discovery Sample that was submitted. We recognized that Relator Matheny's personal involvement does not relate to the actual submission of the Discovery Sample, but we conclude Matheny's detailed allegations of the accounting records, his position at the company, and his involvement with the patient accounts provide sufficient support to Relator Matheny's allegation that he was working on the records used to populate the Discovery Sample and the Discovery Sample itself, and not merely an internal sample. See Walker, 433 F.3d at 1360 (holding explanations as to why relator believed false claims were submitted sufficient when relator had personal knowledge of the scheme).

Second, this is not a case, such as Clausen, where the presentment of a false statement is an element of the cause of action and the sin qua non of liability. See

27

Clausen, 290 F.3d at 1311. Instead, the submission is relevant only to the extent necessary to show a material effect on the government's decision-making. To that end, Relators provide additional factual support to show the Discovery Sample was submitted to the IRO auditor. According to the Complaint, once the Defendants submitted a Discovery Sample, the IRO would review the sample accounts for Overpayments or other errors. If the Discovery Sample resulted in greater than a 5% error rate, a full audit of the Defendants' accounts would occur. For each year between 2005 and 2008, the IRO reviewed the Discovery Sample and found a 0% error rate. If a Discovery Sample had never been submitted, the IRO could not have performed a review or determined an error rate. Moreover, the Complaint alleges the CIA required a Discovery Sample to be submitted every year as part of the larger annual review and supports that allegation with express contract language.[16] The use of the Discovery Sample to determine whether the IRO conducted an entire audit of the Defendants' accounts and the existence of a

---

[16] Defendants argue that the CIA required the IRO to select the random sample and therefore, the Defendants never submitted anything to the IRO. Assuming the IRO selects the random sample itself, the IRO must still be made aware of the total population of Defendants' accounts in order to select a sample. Thus, even under the Defendants' interpretation, the Defendants had to alert the IRO of the accounts in some way. While such conduct may not be sufficient to establish presentment for an (a)(1) claim, it is sufficient to establish a material link between the manipulated records and the government's actions. Moreover, if Defendants manipulated the total population of accounts, as alleged, and the IRO selected a random sample, Defendants caused the IRO to use or make a false (i.e. not random) record. See 31 U.S.C. 3729(a)(2) (imposing liability of a person who "makes, uses, or causes to be made or used" a false statement).

28

contractual obligation to submit the Discovery Sample lends support to Relators' allegations. We conclude Relators have pled all the remaining elements for a reverse false claim for the Discovery Samples and thus, the district court's dismissal of Count II is reversed.

## CONCLUSION

For the foregoing reasons, the district court's dismissal of Count I and II of the Third Amended Complaint is **REVERSED.**