[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13845

Non-Argument Calendar

_____

UNITED STATES OF AMERICA, ex rel.,
et al.,

                                                    Plaintiffs,

MONICA MCKOY,

                                                    Plaintiff-Appellant,

*versus*

ATLANTA PRIMARY CARE PEACHTREE, PC,
NEWNAN FAMILY MEDICINE ASSOCIATES, PC,
CECIL BENNETT,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 3:21-cv-00178-TCB

_____

Before BRANCH, LUCK, and WILSON, Circuit Judges.

PER CURIAM:

Monica McKoy, a former employee of Newnan Family Medicine Associates PC, appeals the dismissal of her False Claims Act and Georgia False Medicaid Claims Act complaint against her former employer, its owner Dr. Cecil Bennett, and Atlanta Primary Care Peachtree, PC, another entity owned by Dr. Bennett. We affirm in part and reverse in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

NFMA and APCP are Georgia corporations that operate medical practices. Dr. Bennett owned APCP until about June 2020. Before Dr. Bennett stopped operating APCP, he took over the practice at NFMA's location from Drs. Kevin Greenwood and Georgia Theriot in May 2019. Beginning in 2015, McKoy worked for Dr. Theriot as a "[f]ront [o]ffice worker/receptionist," and she continued in that role after Dr. Bennett took over NFMA until November 2019.

On October 13, 2021, McKoy filed a complaint against Dr. Bennett, NFMA, and APCP under the False Claims Act and the

Georgia False Medicaid Claims Act.  After the United States and Georgia declined to intervene, McKoy filed her operative amended complaint.  The crux of McKoy's amended complaint is that Dr. Bennett, NFMA, and APCP submitted false claims or caused false claims to be submitted to Medicare and Medicaid through five different schemes.

McKoy alleged she largely learned about the schemes in two ways.  First, McKoy alleged that her position at the front desk (1) gave her "a physical vantage" that let her see "many occurrences" referenced in her amended complaint and (2) required her to handle "patient paperwork and interact with the office personnel responsible for determining billing protocol and procedure."  Second, her mother, Elaine, was NFMA's office manager from 1982 until 2019 and dealt with submitting claims to Medicare and Medicaid.  McKoy alleged that she and Elaine had "extensive conversations" about the process for submitting claims to Medicare and Medicaid as well as "what [Elaine] felt were improper practices with respect to Medicare and Medicaid billing."

We now discuss each alleged scheme in turn.

*The Schemes*

### 1. Genetic Testing

McKoy alleged that Dr. Bennett, through NFMA, submitted false claims related to CGX, PGX, ANS, and BPP genetic tests performed on NFMA patients.  These tests produced false claims, McKoy alleged, in two different ways.  First, the tests weren't medically necessary.  To support that allegation, McKoy claimed that

Dr. Bennett "establish[ed] protocols" that required insured patients to get tested more frequently than uninsured patients.

Second, McKoy alleged that Dr. Bennett engaged in a self-referral and kickback scheme. Allegedly, NFMA would send many of these tests to Zion Laboratory Services, Phoenix Med Lab, and Primary Diagnostics Systems, all of which Dr. Bennett "either owned outright or had an ownership interest in." McKoy learned about this scheme through "several in-person conversations with Laura Faulkner," an NFMA medical assistant, and conversations with her mother. Faulkner also allegedly confirmed that she "regularly received checks directly from Zion and Phoenix labs." That included $796.36 paid directly to Faulkner on about July 23, 2019, which Dr. Bennett paid on Zion's behalf while noting it was for "Zion Checks." McKoy also included details about a phone call Faulkner had with multiple named Zion employees about the alleged kickback scheme.

To support her allegations, McKoy only gave information about a handful of representative false claims submitted pursuant to this scheme. McKoy alleged she herself was given "a BPP test that was sent to Zion" and billed to Medicare along with the claim amount and claim number. McKoy also gave the initials of two Medicare patients who received ANS tests—though she didn't allege which labs handled these tests—and alleged that her daughter received a CGX test on December 11, 2019. She gave no specifics about any of these four tests or an explanation about why these tests were medically unnecessary.

## 2. Follow-Up Visits

The second scheme McKoy alleged involved Dr. Bennett and NFMA's policy requiring patients to attend check-up appointments on an empty stomach. McKoy claimed that if a patient showed up to an appointment without an empty stomach, NFMA staff would schedule the patient for a follow-up appointment on a Friday to perform bloodwork and give the patient "whatever injections" the patient was originally scheduled to receive. Dr. Bennett instructed his staff not to tell patients they needed to arrive with an empty stomach ahead of time. The follow-up appointments were billed under a code that McKoy alleged was reserved for health services that require "some degree of decision making" and therefore wasn't appropriate for bloodwork, injections, and the like. What's more, McKoy alleged that if "anything even slightly abnormal" appeared on a patient's bloodwork the patient was scheduled for a "follow-up phone" call with Millete Plenty, a medical assistant, that was billed under a billing code McKoy alleged was reserved for "face-to-face" appointments with a physician.

McKoy didn't provide much by way of representative claims. She only identified one Medicare patient whose insurance was supposedly billed under the scheme: her father. But she didn't provide any specifics about the appointment or billing—no date of appointment, service received, amount allegedly billed, or claim number.

### 3. Incorrect National Provider Identifier

Next, McKoy alleged that Dr. Bennett billed Medicare and Medicaid through the improper use of national provider identifiers. She again alleged two different ways this happened.

McKoy first claimed that after Dr. Bennett took over NFMA, he billed Medicare for services provided at NFMA using Dr. Theriot's national provider identifier. After Dr. Theriot passed away on August 28, 2019, Dr. Bennett told McKoy and Elaine to keep the bills for services provided after that point. Then, on about September 23, 2019, Dr. Bennett told Elaine to fax copies of the bills and the patients' insurance cards to Roxie Dodge, the person in charge of APCP's billing. Dodge would then bill patients' insurances as if the services were provided at APCP. Dr. Bennett also sent a letter to NFMA patients with Medicare and Medicaid that told them to change their primary care doctor to Dr. Bennett at APCP so that he could bill NFMA services as if they were provided at APCP.

Again, McKoy only provided one example of a patient allegedly billed in this way: her daughter. McKoy alleged that on June 9, 2020, Medicaid was billed under Dr. Bennett's name and APCP national provider identifier. McKoy didn't give the details of the service, the date of the service, the amount billed, or the claim number.

Second and alternatively, McKoy alleged that, even after Dr. Theriot died, Dr. Bennett continued to use her national provider identifier. She provided no details of claims billed or paid under this version of the scheme. Instead, she claimed that certain

documents "indicated" Dr. Bennett billed under Dr. Theriot's number. These documents include lab results for three patients and "request[s] for additional information" for two additional patients. No claims related to these patients were identified.

### 4. Medical Assistants

The fourth scheme McKoy alleged related to NFMA's use of medical assistants to provide services they either weren't qualified to provide or for which federal reimbursement wasn't available. And again, McKoy alleged two different versions of this scheme.

First, McKoy alleged that most days of the week Dr. Bennett left his medical assistants to "operat[e] the office, examin[e] and diagnos[e] patients, and prescrib[e] treatment." To make sure they could do so, Dr. Bennett gave his employees a blank prescription pad with his signature. NFMA would still, however, bill Medicare as if Dr. Bennett provided the relevant service. McKoy didn't provide any specific claim arising out of this scheme, alleging only that she "recall[ed] from her personal observation" that these services were offered to patients with Medicare and Medicaid.

Second, McKoy alleged that, contrary to federal rules governing healthcare reimbursement, some NFMA services were provided by Faulkner and Plenty, who were convicted felons. McKoy gave only one alleged example of Medicare ever being billed for such a service—once again, an appointment attended by her father. McKoy, however, didn't give the date of the service, date of billing, the service provided (other than billing code), the amount billed, or the claim number.

8                     Opinion of the Court                    23-13845

### 5. Annual Wellness Visits

Finally, McKoy alleged that Dr. Bennett billed Medicare and Medicaid for medically unnecessary annual wellness visits. Pursuant to this scheme, insured NFMA patients were given an annual wellness visit survey to complete after their yearly physicals. Patients were then scheduled for annual wellness visits which, while distinct from their yearly physicals, "were almost completely redundant" of the physicals. Like with other schemes, McKoy only gave her father as an example patient who received an annual wellness visit under this scheme. She didn't include the date of the appointment, who provided the services, the date Medicare was billed, how much Medicare was billed, or the claim number.

### *Motion to Dismiss*

Dr. Bennett, NFMA, and APCP moved to dismiss the complaint, arguing that it failed to meet the particularity requirements of Federal Rule of Civil Procedure 9(b). The district court granted the motion.

As to the genetic testing scheme, the district court found that McKoy did not sufficiently allege that any representative test was medically unnecessary and that McKoy's allegations about the self-referral and kickback scheme were too conclusory to meet rule 9(b)'s particularity requirements. The follow-up visit scheme wasn't sufficiently pleaded, the district court concluded, because McKoy didn't allege enough detail about the alleged Medicare claim related to her father. On the incorrect national provider identifier scheme, the district court concluded that the use of an

incorrect identifier was not material to the payment of any claim. The medical assistant scheme didn't meet rule 9(b)'s requirements, the district court found, because McKoy didn't give examples of Medicare or Medicaid being billed for prescriptions written by medical assistants and because McKoy never alleged that services performed by Faulkner or Plenty were excluded from federal reimbursement. Finally, the annual wellness visit scheme didn't satisfy rule 9(b) because McKoy only provided her father as an example and did not include enough details about the alleged billing.

McKoy appeals the dismissal of her complaint.

## STANDARD OF REVIEW

We review de novo a district court's dismissal of a complaint. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

## DISCUSSION

McKoy argues that she satisfied rule 9(b)'s requirements as to each scheme she alleged. But first, the parties disagree on the rule 9(b) standard that applies to McKoy's amended complaint. So we begin by discussing the relevant statutes and pleading standard.

### The False Claims Act and Rule 9(b)

"The FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Phalp v. Lincare Holdings,*

*Inc.*, 857 F.3d 1148, 1154–55 (11th Cir. 2017) (alteration in original) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)).  A false presentment claim requires that the defendant "present (or cause[] to be presented) . . . a false or fraudulent claim for payment" to the government.  *Urquilla-Diaz*, 780 F.3d at 1052.  A false statement claim does not, but, unlike a false presentment claim, a false statement claim requires that the plaintiff show that an allegedly false record or statement "caused the government to actually pay a false claim." *Id.* (quotation omitted).  Georgia courts look to how federal courts apply the False Claims Act when interpreting the Georgia False Medicaid Claims Act.  *See Hill v. Bd. of Regents of the Univ. Sys. of Ga.*, 829 S.E.2d 193, 198 (Ga. Ct. App. 2019).

False Claims Act claims are subject to rule 9(b)'s heightened pleading standard.  *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002).  Rule 9(b) "requires a party alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake."  *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (cleaned up).  "To satisfy this particularity standard" when a plaintiff in a False Claims Act case, known as a relator, brings a false presentment claim, she "must allege the actual 'submission of a false claim'" to the government.  *Id.* (alteration accepted) (quoting *Clausen*, 290 F.3d at 1311).  And when a relator brings a false statement claim, she must "allege with particularity that the defendant's 'false statements ultimately led the government to pay amounts it did not owe.'"  *Urquilla-Diaz*, 780 F.3d at 1052 (quoting *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1329 (11th Cir. 2009)).

Thus, a relator can't simply allege a "scheme in detail but then . . . allege simply and without any stated reason" that she "belie[ves] that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted to the [g]overnment." *Clausen*, 290 F.3d at 1311. She must instead "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent" claims that were presented to or paid by the government. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (per curiam). That means that, to survive a motion to dismiss, McKoy must include details about specific false claims submitted to the government or paid by it—like "copies of . . . actual bill[s]," the "actual dates of claims," completed billing forms, or "the amount of any charges." *See Clausen*, 290 F.3d at 1306. These specifics ensure that a relator's complaint contains "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to [or paid by] the [g]overnment." *Id.* at 1311.

McKoy argues that instead of the above standard, rule 9(b)'s requirements should be "relaxed" for her. Pointing to some of our previous cases where we did not require specific relators to include details of representative billings, McKoy argues that her position gave her enough knowledge about the alleged schemes and submissions of false claims to excuse her from providing representative claims that were billed or paid. We disagree.

McKoy is correct that in some cases we have held that specific relators did not need to include details about representative claims. *See, e.g.*, *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350,

1358 (11th Cir. 2006) (discussing that, in an unpublished case, a relator did not need to identify a representative claim because she worked for seven months in the defendant's billing department); *United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (holding that a nurse practitioner employed by the defendant who was responsible for billing her services and who discussed billing practices with the office administrator did not need to identify representative claims); *see also United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012) ("[W]e are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct."). But McKoy isn't anything like those relators. Those relators had direct, personal knowledge of the allegedly fraudulent schemes either because they provided the services billed for or because their job required them to know the defendant's billing practices or placed them in the defendant's billing department. *See, e.g.*, *McInteer*, 470 F.3d at 1358; *Walker*, 433 F.3d at 1360. Neither applies to McKoy. Thus, the usual rule 9(b) standard applies to her amended complaint.

### The Schemes

So, we move to whether McKoy has satisfied rule 9(b) as to each scheme. In the end, we conclude that McKoy has only met rule 9(b)'s requirements as to the genetic testing scheme—and even then, only to a limited extent.

### 1. Genetic Testing

To reiterate, McKoy alleges that Dr. Bennett presented or caused the government to pay false claims under the genetic testing scheme in two ways. First, because the tests were medically unnecessary. Second, by engaging in an unlawful self-referral and kickback scheme. McKoy hasn't adequately alleged the first version of this scheme, but she has stated a claim under the second.

### A. Medically Unnecessary Tests

One way a relator can establish a claim is "false" is by demonstrating that the claim is for medically unnecessary treatment. *See, e.g.*, *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) ("[C]laims for medically unnecessary treatment are actionable under the [False Claims Act]."). McKoy largely relies on two allegations to argue that NFMA offered medically unnecessary genetic tests: (1) that the protocols that instructed NFMA staff about the tests sometimes distinguished between insured and uninsured patients, and (2) that NFMA allegedly provided uninsured patients a cheaper alternative to the BPP test. McKoy doesn't allege with particularity that any medically unnecessary tests were performed and therefore hasn't stated a claim under this theory. *See Clausen*, 290 F.3d at 1311.

Beginning with the BPP tests, McKoy doesn't provide any detail about the only specific BPP test she identifies—the one performed on her. Most importantly, McKoy never alleges that, or explains why, this test was medically unnecessary. Without that, even assuming the protocols about BPP tests distinguished

between uninsured and insured patients, McKoy has only "allege[d] a mosaic of circumstances that are perhaps consistent with [her] accusations" that false claims were submitted to the government—she hasn't, however, "allege[d] with particularity that these background factors ever converged and produced an actual false claim." *Carrel*, 898 F.3d at 1277.

McKoy's allegations about the ANS tests suffer the same flaw. She provides details about two claims submitted for payment, but she does not give any details about why these tests were medically unnecessary. So, even if the ANS protocol also generally distinguished between uninsured and insured patients, she has not sufficiently pleaded that this distinction ever produced a false claim. *Id.*

Finally, McKoy hasn't satisfied rule 9(b) as to the CGX and PGX tests because she doesn't identify any claim presented to or paid by the government at all; she only lists alleged Medicare patients from whom test samples were collected. Since "the submission of a false claim is the 'sine qua non of a False Claims Act violation,'" her failure to allege that a claim arising out of these tests was presented to or paid by the government is fatal to her allegations. *See Urquilla-Diaz*, 780 F.3d at 1052 (quoting *Hopper*, 588 F.3d at 1328).

In an attempt to argue that she has sufficiently pleaded that the BPP and ANS tests were medically unnecessary, McKoy cites *United States v. Palin*, an out-of-circuit criminal case. *See* 874 F.3d 418, 421 (4th Cir. 2017). *Palin* is inapposite. In *Palin*, a district court

found—after a criminal bench trial—that the defendants offered medically unnecessary tests because they gave insured patients a more expensive test in addition to a cheaper test offered to uninsured patients solely because they were insured. *Id.* But again, even if McKoy has sufficiently alleged that Dr. Bennett's alleged distinctions between insured and uninsured patients *could* produce a false claim—which we don't decide—she never sufficiently links that scheme to a medically unnecessary test billed to or paid by the government.

## B. Self-Referral and Kickbacks

Dr. Bennett, NFMA, and APCP do not dispute that a relator can also establish a claim is false by alleging that it arose out of a violation of the Anti-Kickback Statute or Stark Law. *See McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259–60 (11th Cir. 2005) (holding that a violation of the Anti-Kickback Statute gives rise to a false claim). "The Anti–Kickback Statute makes it a felony to offer kickbacks or other payments in exchange for referring patients 'for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *Id.* at 1259 (quoting 42 U.S.C. § 1320a–7b(b)(2)(A)). The Stark Law generally prohibits a "physician" who "has a financial relationship with an entity" from "mak[ing] a referral to the entity for the furnishing of designated health services." *See* 42 U.S.C. § 1395nn(a)(1)(A). The term "financial relationship" includes "an ownership or investment interest in the entity." *Id.* § 1395nn(a)(2)(A).

Here, McKoy has alleged both a violation of the Anti-Kick-back Statute and of the Stark Law with particularity. As to the alleged kickback scheme, McKoy explained that Faulkner told her that Faulkner "regularly received checks directly from Zion and Phoenix labs." McKoy backed up that allegation with a specific example—she alleged that on about July 23, 2019, after a check from Zion labs bounced, Dr. Bennett paid Faulkner $796.36 for "Zion Checks." McKoy also alleged that on a specific phone call—dated about August 23, 2019—named Zion employees discussed the kickback scheme with Faulkner.

As for McKoy's Stark Law theory, she alleged both that Dr. Bennett had an ownership interest in Zion, Phoenix, and Primary Diagnostics, and that she learned about Dr. Bennett's ownership interests and practices surrounding referral to these labs from Elaine and Faulkner.

Finally, as to both schemes, McKoy gave specifics about a representative claim submitted to Medicare while the scheme was ongoing: a BPP test performed on McKoy herself on August 12, 2019, that was sent to Zion, for which she gave the billing amount and claim number. Taken together, these allegations provide all that is needed to state a False Claims Act claim—"the 'who,' 'what,' 'where,' 'when,' and 'how' of" the allegedly fraudulent scheme, *see Corsello*, 428 F.3d at 1014—and ensure "(1) that the defendant[s] ha[ve] been made aware of the particular circumstances for which [they] will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts," *Gose v.*

*Native Am. Servs. Corp.*, 109 F.4th 1297, 1318 (11th Cir. 2024) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).  McKoy has stated a claim under this theory.

### 2.  Follow-Up Visits

Moving to the second scheme, McKoy has failed to meet rule 9(b)'s requirements because she did not provide sufficient detail about a representative false claim.  The amended complaint only generally alleges that McKoy's father "was a Medicare beneficiary" and that his insurance was billed for a visit under this scheme.  But without more information—like a copy of the alleged bill, the date of billing, the claim amount, or the claim number—McKoy hasn't sufficiently alleged this scheme culminated in a false claim.  *See Clausen*, 290 F.3d at 1312 (dismissing a claim because the relator did not provide amounts charged, the date of the service, policies about billing, or copies of a bill).

### 3.  Incorrect National Provider Identifier

For the same reason, while the district court relied only on the materiality of the incorrect national provider identifier, McKoy hasn't satisfied rule 9(b) as to the national provider identifier scheme either.  *See Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) (per curiam) ("We may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below.").  McKoy only identifies one alleged claim submitted to the federal government through Dr. Bennett's national provider identifier at APCP, which was for services offered to McKoy's daughter.

But McKoy does not allege specifics about this claim, like who provided the services, the billing amount, the claim number, or even where the services were offered. That final omission is particularly noteworthy, because McKoy never alleged her daughter's appointment took place after APCP shut down, so the amended complaint leaves open the possibility that the appointment was at APCP and therefore it was correct to use Dr. Bennett's APCP national provider identifier. Further, McKoy doesn't allege the existence of any claim submitted through Dr. Theriot's national provider identifier. Without these allegations, McKoy has alleged, at most, a scheme in detail without including enough information to ensure "that claims requesting illegal payments" were presented to or paid by the government and so hasn't offered the "indicia of reliability" required by rule 9(b). *Clausen*, 290 F.3d at 1311.

### 4. Medical Assistants

McKoy's allegations related to NFMA's medical assistants—that they would write prescriptions using Dr. Bennett's prescription pad and that Dr. Bennett employed Faulkner and Plenty even though they were convicted felons—also fail to satisfy rule 9(b). First, McKoy doesn't sufficiently link her allegations about either version of the scheme to any "specific fraudulent claim [that] was in fact submitted to [or paid by] the government." *Corsello*, 428 F.3d at 1014. As for the allegedly improper prescriptions, McKoy doesn't offer any representative claim at all—she only alleges that she "recalls . . . that the improper rendering of

the[] services was performed for patients with Medicare and Medicaid." The allegations about Faulkner and Plenty's felon status are the same. Once again, McKoy only identifies a single claim related to her father. But just like her other allegations related to her father, she gives no specifics about this claim—no date of the service, no date or amount of the billing, and no claim number. *See Clausen*, 290 F.3d at 1306.

Second, as the district court explained, McKoy doesn't sufficiently allege that, even if Faulkner and Plenty were convicted felons, their services couldn't be reimbursed. While McKoy alleges that "convicted felons are generally excluded from providing services submitted for reimbursement to federal healthcare programs," the statutes she cites show that this exclusion only applies to individuals convicted of specific offenses, and for some offenses, only if the conviction was after a specific date. *See generally* 42 U.S.C. §§ 1320a-7, 1320a-7a. Yet McKoy does not allege that either Faulkner or Plenty are actually excluded under these statutes, nor does she allege enough information to determine if they are. Without that, McKoy hasn't shown an "indicia of reliability," *see Clausen*, 290 F.3d at 1311, that a false claim was submitted to or paid by the government, *see Hopper*, 588 F.3d at 1324 (stating that the relator must allege "specifically the details of the defendants' allegedly fraudulent acts" (quotation omitted)).

### 5. Annual Wellness Visits

Finally, McKoy hasn't met rule 9(b)'s requirements as to the annual wellness visit scheme. That's because, like with some of the

other schemes, McKoy only gives her father as an example of a Medicare patient whose insurance was billed for an annual wellness visit. And she again gives no details; she doesn't provide, among other information, a date of service, claim amount, or claim number. *Clausen*, 290 F.3d at 1306. For the same reasons discussed above, those allegations aren't enough to provide the "indicia of reliability" rule 9(b) requires. *See id.* at 1311.

## CONCLUSION

McKoy has sufficiently pleaded a claim arising out of the alleged self-referral and kickback scheme, but her remaining claims were properly dismissed. We therefore largely affirm, reverse in part, and remand.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**