UNITED STATES of America ex rel., Victor E. BIBBY and Brian J. Donnelly, Relators/Plaintiffs,

v.

WELLS FARGO BANK, N.A., individually and as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendants.

Civil Action No. 1:06–CV–0547–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 19, 2012.

Amy L. Berne, Daniel A. Caldwell, III, Laura Kennedy Bonander, Office of United States Attorney; James Edward Butler, Jr., Brandon L. Peak, Leigh M. May, Samantha DiPolito, Butler, Wooten & Fryhofer, LLP; Marlan Bradley Wilbanks, Tyrone M. Bridges, Wilbanks & Bridges, LLP; Mary Louise Cohen, Timothy P. McCormack, Phillips & Cohen, for Plaintiff.

William Vance Custer, IV, Bryan Cave, LLP; Amy Pritchard Williams, Robert J. Sherry, K & L Gates; Charles T. Huddleston, Linda Ann Klein, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC; David Lewis Balser, King & Spaulding, LLP, for Defendants.

## *ORDER*

AMY TOTENBERG, District Judge.

TABLE OF CONTENTS

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1291
Standard for Motions to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1292
Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1292
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1294
Applicability of FERA Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1294
Rule 9(b) Pleading Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1295
Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1302
Donnelly Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1304
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1306

## I. SUMMARY

This matter is before the Court on Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss [Doc. 168].

Relators allege that Defendant has engaged in a fraudulent scheme to overcharge veterans on closing costs during the origination of loans under a United

States Department of Veterans Affairs ("VA") loan refinancing program. Relators allege that Defendant created false documents and made false demands for payment under void VA loan guarantees in violation of the False Claims Act.

For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Wells Fargo's Motion to Dismiss Relators' Second Amended Complaint ("Second Amended Complaint" or "SAC").

## II. STANDARD FOR MOTIONS TO DISMISS

### A. Standard Under Rule 12(b)(6)

Defendant has moved to dismiss Relators' Second Amended Complaint for "failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1216 (3d ed. 2002); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In considering a Rule 12(b)(6) motion, the court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir.1993). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

## III. FACTUAL BACKGROUND [1]

Relators Victor E. Bibby and Brian J. Donnelly are licensed mortgage brokers. Through their company, U.S. Financial Services, Inc., d/b/a Veteran's Mortgage, they specialize in the brokering and origination of VA loans, including through the VA Interest Rate Reduction Refinancing Loan ("IRRRL") program. (2d Am. Compl. ¶ 54.) Since 2001, Relators' company has brokered thousands of VA IRRRL loans across seven states. (*Id.*) As brokers, Relators work directly with veterans to take their applications, gather necessary documents, and connect them with a lender who actually originates the loan. (*Id.* ¶ 52.) The broker acts as an intermediary between lender and borrower, and the lender must approve the loan application and ensure compliance with VA regulations prior to the loan closing. (*Id.* ¶¶ 52, 55.)

Retired and active duty veterans who have a VA mortgage on the home they currently own are eligible to apply for an IRRRL loan. (*Id.* ¶ 30.) The program allows these veterans to refinance their existing mortgages to take advantage of lower interest rates or shorter repayment terms. (*Id.*) Because the VA designed the IRRRL program with the goal of lowering veterans' mortgage payments through refinancing, and because the resulting mortgage loans are guaranteed by the United States government, the VA strictly limits the closing costs a lender may charge on an IRRRL loan. (*Id.* ¶ 31.) In addition to certain enumerated fees which lenders may charge the veteran, such as recording fees, credit report fees, and fees for title examination and title insurance, the VA

---

1. Consistent with the above-described standard, the Court accepts the facts pled in the Second Amended Complaint as true in evaluating Defendant's Motion to Dismiss.

authorizes a flat charge not to exceed one percent of the loan amount. (*Id.* ¶ 34.) The permissible fees a lender may charge to a veteran for an IRRRL refinance do not include attorney's fees for closing the loan. (*Id.*) Rather, the lender must pay any closing attorney's fees from its own funds or as part of the 1% origination fee it is permitted to assess the veteran. (*Id.* ¶ 36.) Lenders are required to affirmatively certify to the VA that they have complied with the VA rules and regulations for each IRRRL loan. (*Id.* ¶ 37.) This written certification is a condition precedent to the VA's issuance of a loan guaranty. (*Id.*)

Through their work brokering IRRRL loans, Relators learned that Defendants were routinely violating the VA rules and regulations and falsely certifying to their compliance with these rules. (*Id.* ¶ 61.) Relators' practice was to inform prospective IRRRL borrowers of the expected attorney's fee charge (along with other anticipated closing costs for the loan) on the "Good Faith Estimate," a form that brokers and lenders provide to a loan applicant early in the application process. (*Id.* ¶ 56.) The lender was then responsible for listing all finalized charges on the HUD form provided to the borrower at the loan closing. (*Id.*) However, Relators observed that the lender was altering the HUD forms in order to avoid showing a charge for attorney's fees, and instead lumping that charge in with title examination or title search fees. (*Id.*) Eventually, the lender began instructing Relators not to show a charge for attorney's fees in the Good Faith Estimate, but instead to add the attorney's fees into the title examination fee. (*Id.* ¶ 57.) When Relators contacted the VA for guidance regarding this issue, the VA referred them to the VA Lender Handbook. (*Id.* ¶ 58.) Relators learned from reviewing the VA Lender Handbook that attorney's fees may not be charged to a veteran and must come out of

the lender's 1% flat charge per the VA regulations. (*Id.* ¶ 60.) Although title search and examination charges may be assessed to the veteran, VA regulations prohibit charging more than the reasonable and customary amount for this work. (*Id.* ¶ 61.) Relators allege that Defendant lender has routinely inflated the amounts charged for title examination and title search "for the purpose of hiding that they were charging veterans for unallowable attorneys [sic] fees and other fees." (*Id.*)

Relators provide a specific example loan originated by Defendant to demonstrate how the bank concealed unauthorized attorney's fees by adding them to title search and examination fees and falsely certified to the VA full compliance with program rules, thereby obtaining an unauthorized VA guaranty. (*Id.* ¶¶ 97–110.) Relators aver based on their extensive experience originating IRRRL loans in seven states that the reasonable and customary charge for title search and examination fees ranges from $125 to $200. (*Id.* ¶ 63.) In the example loans pled, Defendant charged veterans padded title search and examination fees of $450, $745, and even $950. (*Id.* ¶¶ 98, 99, 101.)

Based on their experience brokering IRRRL loans with Defendant, Relators allege that Defendant fraudulently submitted multiple false certifications to the VA in connection with each loan containing improper closing costs. Relators allege that when requesting the loan guaranty Defendant submitted VA Form 26–8923, the "Interest Rate Reduction Refinancing Loan Worksheet," to the VA. (*Id.* ¶ 90.) On line 8 of this worksheet, Defendant was required to list the "allowable closing costs" for the loan. (*Id.*) Defendant committed fraud by hiding unallowable attorney's fees within other permissible charges and then expressly certifying that the information provided on the form was "true, accurate and complete." (*Id.*) Defendant

falsely certified to the VA that the HUD form for each noncompliant loan signed at the closing was a "true and accurate account of the transaction." (*Id.* ¶ 91.) Defendant also submitted Form 26–1820 to the VA for each IRRRL loan. (*Id.* ¶ 92.) On this form, Defendant expressly certified that it "[had] not imposed and will not impose any charges or fees against the veteran borrower in excess of those permissible under the schedule as set forth in paragraph (d) of 38 C.F.R. 36.4312." (*Id.*) For loans where Defendant charged veterans for attorney's fees in excess of the 1% flat origination fee allowed, this certification was false. (*Id.* ¶ 93.)

Relators allege that the example loan, in addition to other noncompliant IRRRL loans originated by Defendant, went into default and foreclosure, resulting in a claim on the guaranty. The nationwide default rate for IRRRL loans is 18%. (*Id.* ¶ 78.) Of VA loans that go into default, approximately 50% result in foreclosure. (*Id.* ¶ 79.) When an IRRRL loan goes into default, the VA expends funds by virtue of its guaranty obligation regardless of whether the default results in foreclosure. (*Id.* ¶¶ 72–76, 111.) VA regulations require a lender to notify the VA of a borrower's default after the 61st day of nonpayment.[2] (*Id.* ¶ 73.) The VA then takes an array of steps to attempt to avoid foreclosure, including reimbursing the servicing lender for costs incurred in protecting the value of the collateral and making incentive payments to the servicing lender when it succeeds in working with the borrower to bring the loan out of default. (*Id.* ¶¶ 73–76.) Relators allege that the average cost to the VA of a default on an IRRRL loan is $15,000, even when the VA is successful in avoiding foreclosure. (*Id.*

¶ 81.) Between 2001–2008, Relators allege that the VA has expended in excess of $2.5 billion in taxpayer funds on payments to various lenders resulting from defaulted IRRRL loans. (*Id.* ¶ 83.) Relators aver that Defendant has benefited from unauthorized VA guarantees on thousands of IRRRL loans that are not qualified for the guaranty by virtue of noncompliance with the limits on allowable closing costs. (*Id.* ¶ 86.)

## IV. DISCUSSION

Defendant Wells Fargo has moved to dismiss Relators' Second Amended Complaint on two grounds. First, Defendant argues that Relators have failed to plead their claims with sufficient particularity under Federal Rule of Civil Procedure 9(b). Second, Defendant claims that Relators have not identified the particular false claim that was allegedly submitted to the government. The Court addresses each argument in turn after addressing the preliminary matters of the applicable version of the statute appropriate for consideration on the motion to dismiss.

### A. Applicability of FERA Amendments

Defendant argues that Relators' SAC does not apply to claims pre-dating the Fraud Enforcement and Recovery Act of 2009 ("FERA") because the Eleventh Circuit has held that FERA is not retroactive. In May 2009, Congress enacted FERA, which amended and renumbered sections of the False Claims Act. *See* Pub.L. No. 111–21, 123 Stat. 1617. In relevant part, FERA renumbered 31 U.S.C. §§ 3729(a)(1) and (a)(2) of the FCA as §§ 3729(a)(1)(A) and (a)(1)(B). Defendants contend that by citing

---

**2.** Relators allege that the submission of the Notice of Default, Form 26–6850(a), for a loan tainted by unauthorized closing costs constitutes a false claim. (2d Am. Compl.

¶ 95.) For loans where the default is not cured, this form is followed by Form 26–1874, Claim Under Loan Guaranty. (*Id.* ¶ 96; Griffin Decl. Ex. Q, Doc. 166–4 at 434–35.)

§§ 3729(a)(1)(A) and (a)(1)(B)—the post-FERA numeration—Relators' SAC "reflects a conscious decision to plead only under the post-FERA FCA" and, therefore, encompasses only Relators' post-FERA claims. In support of this contention, Defendant contrasts the original complaint's citation to pre-FERA numeration.[3]

The Eleventh Circuit has ruled that FERA is retroactive to claims for payment submitted to the federal government pending on or after June 7, 2008, regardless of when the litigation was filed. *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318 n. 3 (11th Cir.2009). Section 4(f)(1) of the Act provides that the amendments "shall take effect as if enacted on June 7, 2008, and apply to all claims . . . that are pending on or after that date." Pub.L. No. 111–21, § 4(f)(1), 123 Stat. at 1625. In *Hopper*, the Eleventh Circuit interpreted the word "claim" to mean "any request or demand . . . for money or property," as defined by the amended 31 U.S.C. § 3729(b)(2)(A). This language does not mean that all claims pre-dating June 7, 2008 are rendered void, as Defendant would have the Court hold. Instead, § 4(f)(1) merely dictates whether the FCA's pre-FERA or post-FERA language applies to a pending case. *See Hopper*, 588 F.3d at 1318 n. 3 (holding that the post-FERA FCA did not apply retroactively to a case in which no

claims were pending on or after June 7, 2008). Because Relators' SAC does not identify a false claim for payment pending as of June 7, 2008, the Court finds that FERA does not apply retroactively to this case.[4]

### B. Rule 9(b) Pleading Standard

Defendant argues that the Second Amended Complaint should be dismissed on the basis of Relators' failure to plead with particularity. The Eleventh Circuit requires False Claims Act violations to be pled with particularity under Rule 9(b). *Id.* at 1324. Therefore, Defendant argues that Relators' Second Amended Complaint must set forth facts as to the who, what, when, where, and how of the fraud. *Id.*; *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir.2012). In contrast to the particularized standard a complainant must use in alleging the mechanics of the fraud, a complainant may plead the scienter portion of fraud generally. *Id.* at 1224; Fed.R.Civ.P. 9(b) (providing that at the pleading stage, "knowledge, and other conditions of a person's mind may be alleged generally").

### 1. Government guaranteed loan cases under the FCA

Before examining Relators' pleading here, it is helpful to consider the body of case law involving FCA claims arising out

---

**3.** The Court notes that while Relators' SAC cites to the post-FERA numeration, the applicability of FERA's amendments is a question to be determined by the Court. Relators do not forfeit pre-FERA claims simply by referencing post-FERA numeration. Furthermore, Defendant's contention that the SAC reflects "a conscious decision to plead only under the post-FERA FCA" is unconvincing. In addition to renumbering portions of the FCA, FERA also amended the FCA's language. For example, FERA amended 31 U.S.C. § 3729(a)(2) (2003) by replacing the phrase "knowingly makes . . . a false record or statement *to get a false or fraudulent claim paid or approved by the government*" with the phrase

"knowing makes . . . a false record or statement *material to a false or fraudulent claim.*" Pub.L. No. 111–21, § 4, 123 Stat. 1617, 1621 (emphasis added). When citing this section, Relators' SAC does not adopt either phrase specifically, but rather paraphrases the relevant language. This leaves only the SAC's citation to the post-FERA re-numeration to suggest any explicit recognition of the FERA amendments by Relators. That, alone, is insufficient to justify forfeiture of Relators' pre-FERA claims, as Defendant argues.

**4.** The Court's citations to U.S.Code sections will, therefore, refer to the pre-FERA sections of the FCA.

of fraudulent applications for federally guaranteed loans. In the Supreme Court's first look at government guaranteed loans under the FCA, *U.S. v. McNinch,* 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958), the government sought to impose liability on a home improvement company that had caused several lenders to file false applications for loan insurance from the Federal Housing Administration ("FHA"). 356 U.S. at 596–97, 78 S.Ct. 950. No default had yet occurred on the loans in question, and the Court concluded that "a lending institution's application for credit insurance under the FHA program [was] not a 'claim' as that term is used in the False Claims Act." *Id.* at 598, 78 S.Ct. 950. The Court expressly left open the question of "whether a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a 'claim' covered by the [Act]." *Id.* at 599 n. 6, 78 S.Ct. 950.

In *United States v. Veneziale,* 268 F.2d 504 (3d Cir.1959), the Third Circuit took up the question reserved by the Supreme Court in *McNinch.* The circuit court held that the United States was entitled to relief under the FCA where the defendant caused a couple to make a fraudulent application for an FHA guaranteed loan that later went into default. 268 F.2d at 506. The fraudulent loan application, which "falsely represented that the loan was wanted for home improvements" when in fact it was used to purchase real property from the defendant, "became one of the essential documents which induced the [FHA] to guarantee payment of the bank loan." *Id.* at 504. The circuit court reasoned that "the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money." *Id.* at 505. The fact that the guaranty obligated the

government to make payment to an innocent third party was no barrier to FCA liability. *Id.* The claim was still "grounded in fraud" in that "a fraudulent misrepresentation induced the government to assume the obligation which it has had to perform." *Id.* at 506. Thus, the defendant's fraud in inducing the government to guaranty the loan ripened into a FCA violation when the loan later went into default and the government was required to honor the guaranty. *Id.*

Other circuit courts have followed suit, finding a viable FCA claim in situations where the defendant fraudulently submitted the paperwork necessary to obtain a government assurance and a subsequent default on the loan resulted in the government's expenditure of funds. *See United States v. Ekelman & Assocs., Inc.* 532 F.2d 545, 550–51 (6th Cir.1976) (where defendants caused veterans to submit false applications for VA and FHA guaranteed mortgages, "no cause of action arose under the [FCA] until the mortgage holder presented a claim to the VA or FHA for payment on the guaranty"); *United States v. Rivera,* 55 F.3d 703, 707 (1st Cir.1995) (a lender's claim on the falsely obtained guaranty "in effect completes the perpetrator's violation of the FCA"); *United States v. Van Oosterhout,* 96 F.3d 1491, 1494 (D.C.Cir.1996) ("It is generally accepted that the false application for a guaranteed loan by the debtor establishes only an 'inchoate' violation of the Act that does not ripen into a claim actionable under the statute until a later event of legal consequence between the lender and the government.... [A]n actual payment to the lender qualifies as the event that effectuates the 'claim' for the government has 'disbursed funds.' ") (citing *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958)).[5]

---

**5.** *See also United States v. Klein,* 230 F.Supp. 426, 442 (W.D.Pa.1964) (finding defendants

liable under the FCA for procuring veterans to apply for VA guaranteed loans for proper-

■ The government creates subsidized or guaranteed lending programs with a particular public purpose—e.g., to encourage lending to first-time homebuyers, reduce borrowing costs for veterans, or spur community economic development. While a fraudulent application or certification used to obtain a government-backed loan in contravention of this public purpose does not result in an immediate drain on the federal fisc, it does result in the government taking on an obligation to expend funds if the loan goes into default. Thus, the initial fraudulent conduct in obtaining a government guaranty creates an inchoate FCA violation that becomes choate if and when a loan subsequently goes into default and results in a demand for government payment. *See Rivera*, 55 F.3d at 707.

### 2. Collective pleading

As an initial matter, Defendant argues that Relators have run afoul of the Rule 9(b) pleading requirements by lumping 14 different lenders together in most of the central factual allegations of the complaint. In *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364 (11th Cir. 1997), the Eleventh Circuit clarified that in a fraud case involving multiple defendants, to comply with Rule 9(b) "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* at 1381. The plaintiffs in *Brooks* "lumped together" three insurer defendants and an administrator defendant in their fraud-based claims, alleging that each "directly or indirectly, in combination or conspiracy with each other" engaged in racketeering activities. *Id.* The complaint thus failed to meet the requirements of Rule 9(b) because it was "devoid of specific allegations with respect to the separate Defendants" that would inform each individual defendant of the specific acts that gave rise to its liability. *Id.; see also Ambrosia Coal & Constr. Co. v. Morales*, 482 F.3d 1309, 1317 n. 12 (11th Cir.2007) (complaint dismissed on Rule 9(b) grounds for failure to describe the nature of each defendant's participation in the joint fraudulent scheme). Thus, a complaint fails to satisfy the 9(b) pleading standard where it makes vague, collective allegations against defendants with different roles.

Here, Relators are not alleging that Defendant acted in concert with various other lenders in a fraudulent scheme. Rather, Relators allege that each lender individually made false certifications of program compliance to the VA before, during, and after the closings of IRRRL loans. (2d Am. Compl. ¶¶ 87–96.) Relators then separately describe one example IRRRL loan in which Defendant charged the veteran borrower for unauthorized attorney's fees and hid them by padding the title fees. (*Id.* ¶¶ 97–107.) In the remaining paragraphs, Relators allege that the example loan and other similar loans extended by each lender went into default, resulting in the submission to the VA of false claims for pay-

ties they never intended to occupy, which subsequently went into foreclosure), *aff'd mem.*, 356 F.2d 983 (3d Cir.1966); *United States v. Inc. Village of Island Park*, 888 F.Supp. 419, 440 (E.D.N.Y.1995) ("[T]he Village's fraudulent conduct caused false claims to be presented to the government by the innocent mortgagee on behalf of purchasers who were illegally selected in violation of the first-come, first-served requirements [of the Community Development Block Grant program].''), *United States v. Goldberg*, 256 F.Supp. 540, 541 (D.Mass.1966) (the essential act for a FCA violation occurred when the defendant defaulted on the FHA-insured loans, which "caused a claim for payment to be presented to the United States"); *United States v. Ettrick Wood Products, Inc.*, 774 F.Supp. 544, 551 (W.D.Wis.1988) (defendants were liable under FCA for creating false application documents to obtain loans guaranteed by the Farmers Home Administration which subsequently went into default).

ment. (*Id.* ¶¶ 108–116.) Similarly, the paragraphs summarizing and restating the elements of the FCA claims against each defendant lender apply equally and identically to Defendant Wells Fargo. (*Id.* at ¶¶ 118–128.)

This is not a situation where the collective pleading of fraud-related allegations against "defendants" results in a lack of clarity as to what conduct is alleged against each individual defendant. The substantive allegations would have been unchanged if Relators had copied the relevant paragraphs 10 times and replaced the word "Defendants" with Wells Fargo. Because the collective pleading approach Relators employed has not created confusion regarding the specific conduct attributable to each defendant, this practice does not require dismissal under Rule 9(b). *See Acciard v. Whitney,* No. 207–CV–476–UA–DNF, 2008 WL 5120898 (M.D.Fla. Dec. 4, 2008) (motion to dismiss denied where allegations were grouped together for defendants with the same role and plaintiffs had *not* "su[ed] several defendants that had different parts in a scheme and asserted every allegation against all defendants generally"). Thus, the Court proceeds to determine whether in other respects the complaint is pled with sufficient particularity under Eleventh Circuit precedent.

### 3. Pleading with particularity under Rule 9(b)

Relators here allege that Defendant violated the FCA through the presentment of false claims and use of false documents to induce the government to pay false claims on noncompliant IRRRL loans. So-called "presentment" and "use" claims have different elements. To allege a presentment violation under 31 U.S.C. § 3729(a)(1), a relator must plead: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval, (3) with knowledge

that the claim was false." *U.S. ex rel. Stephens v. Tissue Sci. Labs., Inc.,* 664 F.Supp.2d 1310, 1315–16 (N.D.Ga.2009). To assert a False Claims Act violation based on use of a false document under 31 U.S.C. § 3729(a)(2), a relator must allege: "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318, 1327 (11th Cir.2009). Based on the analysis below, the Court finds that Plaintiffs' allegations are sufficient to establish a false document claim under § 3729(a)(2), but not a presentment claim under § 3729(a)(1).

Defendant contends that Relators have not provided particularized factual support for their contention that Defendant presented to the government false claims for payment in violation of the FCA. Thus, Defendant argues, neither Relators' use of false documents nor presentment claims can survive dismissal under the principles of pleading that the Eleventh Circuit set forth in *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1308–1312 (11th Cir.2002) and its progeny. *See, e.g., United States ex rel. Atkins v. McInteer,* 470 F.3d 1350 (11th Cir.2006); *Hopper,* 588 F.3d 1318.

In *Clausen,* the Eleventh Circuit held that Rule 9(b)'s particularity requirement applies to both the details of the false claim and the presentment of that claim to the United States for payment. "Rule 9(b)'s directive ... does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been sub-

mitted to the Government.... [A]s with every other facet of a necessary False Claims Act allegation, if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." 290 F.3d at 1311.

■ The Eleventh Circuit's subsequent cases make clear, however, that a somewhat more flexible, case-by-case approach to *Clausen's* principles may be properly applied where the relator's complaint provides "indicia of reliability" that support the relator's allegations that the defendant submitted actual fraudulent claims to the government. *See generally Cade v. Progressive Community Healthcare, Inc.*, No. 1:09–CV–3522–WSD, 2011 WL 2837648, at *3–7 (N.D.Ga. July 14, 2011) (Duffey, J.) (collecting and synthesizing Eleventh Circuit qui tam pleading cases). Thus, in *United States ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1359–60 (11th Cir.2005), the court found that the relator nurse practitioner's complaint properly survived dismissal where the plaintiff's allegations were based on her personal employment experience within defendant's medical practice and her conversations with the office administrator regarding the billing procedures at issue. *See also United States ex rel. Matheny*, 671 F.3d at 1230 ("As Defendants recognize, we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct."); *Hill v. Morehouse Medical Associates, Inc.*, No. 02–14429, 2003 WL 22019936, at *3, *5 (11th Cir. Aug. 15, 2003) (observing that "Rule 9(b)'s heightened pleading standard may be applied less stringently ... when specific 'factual information [about the fraud] is peculiarly within the defendant's knowledge or control' " and where plaintiff pled sufficient facts as an employee based on her first hand witnessing of the fraudulent conduct to provide "the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme"); *Clausen*, 290 F.3d at 1314 n. 25 (recognizing that Rule 9(b) standard may be relaxed in "appropriate circumstances to aid those alleging prolonged multi-act schemes" provided the relator alleges "at least some examples of actual false claims to lay a complete foundation" for the rest of his complaint); *United States ex rel. King v. DSE, Inc.*, No. 8:08–CV–2416–T–23EAJ, 2011 WL 1884012, at *1–3 (M.D.Fla. May 17, 2011) (Merryday, J.) (finding that where relator's allegation of the falsity of the defendant's certification that defendant's manufactured items complied with contract specifications was based upon his own knowledge and involvement in the manufacturing process, complaint afforded the requisite reliability to support the relator's False Claims Act claims).

Relators' allegations manifest some indicia of reliability based on Relators' active role as agents in preparing the mortgage paperwork necessary to obtain the guarantees that later culminated in claim submissions. Acting as mortgage brokers for IRRRL loans, Relators worked directly with veterans applying to refinance with Wells Fargo. (2d Am. Compl. ¶¶ 54–56.) Relators helped borrowers complete the loan application and submit the required paperwork to these lenders, and the lenders then instructed Relators on how to prepare the loan package. (*Id.*) Relators received instructions from Defendant not to show the attorney's fees charge on the Good Faith Estimate Relators were required to provide to the borrower, but rather to add the expected attorney's fees to the charge shown for title examination. (*Id.* ¶¶ 56–57.) Although Relators did not attend loan closings, Defendant sent Relators a copy of the Settlement Statement after each loan closing, and these docu-

ments confirmed the concealment of unauthorized attorney's fees ultimately charged to the borrowers. (*Id.* ¶ 65.) Relators' allegations therefore manifest personal knowledge that Defendants made false certifications of IRRRL program compliance, lending reliability to this aspect of their claims.

■ However, these indicia of reliability do not extend to Defendant's presentment of claims on defaulted loans. Relators do not allege that they had any involvement with Defendant's servicing of IRRRL loans or direct knowledge of how Defendant proceeded when IRRRL loans went into default. Rather, Relators' personal knowledge is limited to the fraudulent scheme surrounding the origination of IRRRL loans—the concealment of attorney's fees improperly charged to veterans and related false certifications of program compliance to the VA in order to obtain an unauthorized guaranty. Relators have pled neither indicia or reliability nor detailed facts regarding the who, what, when, and how of Defendant's actual presentment of false claims to the government through submission of the Claim Under Loan Guaranty, Form 26–1874, for each of the fraudulently guaranteed loans.

For the example loan identified in the complaint originated by Wells Fargo, Relators have attached to their response briefs publicly filed documents showing that the loans went into foreclosure and the VA became the owner of the property.[6] However, these documents do not show whether, when, or how Defendant actually sub-

mitted a claim to the VA. On the contrary, the foreclosure deed for the First Tennessee loan reveals that First Tennessee no longer owned the loan at the time of foreclosure, suggesting that it almost certainly did not make a claim under the loan guaranty. (*See* Claim Under Loan Guaranty Form, Griffin Decl. Ex. Q, Doc. 166–4 at 434–45, requiring the claimant to certify that it is the owner of the loan.)[7]

The failure to plead the specifics of any actual claim Defendant submitted to the government under void guarantees or indicia of reliability, such as personal knowledge of Defendant's claim submission process, is fatal to Relators' presentment claims. *Hopper*, 588 F.3d at 1326 (dismissing presentment claim as deficient under Rule 9(b), explaining, "[R]elators do not allege personal knowledge of the billing practices of any person or entity. The complaint does little more than hazard a guess that unknown third parties submitted false claims for Medicaid reimbursement.").

■ However, the failure to allege presentment of false claims with particularity does not require dismissal of Plaintiffs' claims against Defendants for the use of false documents or making of false statements under the False Claims Act. This clause of the Act imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."[8] 31 U.S.C. § 3729(a)(2) (2008). The Eleventh Circuit has stated that a

---

6. Resp. Opp. Wells Fargo Mot. Dismiss, DiPolito Decl. Ex. 14, Doc. 239–16; Resp. Opp. First Tennessee Mot. Dismiss, DiPolito Decl. Ex. 15, Doc. 255–17; Resp. Opp. CitiMortg. Mot. Dismiss, DiPolito Decl. Ex. 13, 14, Doc. 264–15, 264–16. As explained above, the Court takes judicial notice of these publicly filed real property records.

7. It is possible to allege a viable presentment claim against a defendant who *causes* the

submission of a false claim by an innocent third party. *See United States v. Veneziale*, 268 F.2d 504, 505–06 (3d Cir.1959). However, Relators did not plead the claim this way. Instead, they pled no factual detail of the actual submission of any false claim.

8. As explained above, the May 2009 FERA amendments of the statutory language do not

claim under § 3729(a)(2) "does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement was ever submitted to the government." *Hopper*, 588 F.3d at 1327. "Plaintiffs are not required to allege what they are not required to prove." *Id.* Therefore, to state a use of false documents claim under the FCA a Plaintiff must plead that a defendant "made a false record or statement for the purpose of getting a false claim paid or approved by the government" and that the government did, as a result, pay or approve a claim to the defendant or a third party. *Id.; Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 665, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) ("[A] plaintiff asserting a § 3729(a)(2) claim must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim.") A § 3729(a)(2) claim therefore does not require a plaintiff to plead the facts as to the specific element of "presentment" of a false claim with particularity. *Hopper*, 588 F.3d at 1327.

■ Here, Relators have made factually specific allegations regarding the mechanics of Defendant's routine practice of creating false documents and making false statements to the VA in order to obtain guarantees on loans that were not qualified for a guaranty under VA regulations. (*See* 2d Am. Compl. ¶¶ 56–111.) As discussed above, Relators have explained the personal basis for their knowledge of these practices, providing indicia of reliability. (*Id.* ¶¶ 56–61.) Moreover, Relators have specifically described an example loan involving Defendant where Defendant charged unlawful attorney's fees to the veteran, falsely certified compliance with the VA regulations on authorized closing costs, obtained the VA guaranty on the

basis of that false certification, and subsequently foreclosed (or sold the loan to another bank who foreclosed), requiring the VA to expend funds. (*Id.* ¶¶ 97–111.) Relators have plausibly pled that Defendant intended its false certifications of compliance with all VA regulations to be relied upon by the government in extending a loan guaranty that would be effective in the event of a default. Relators' quasi-insider status, working directly with Defendant to calculate the up-front closing costs charged and disclosed (or not disclosed) to veteran borrowers, supplies indicia of reliability supporting the key allegation of a 31 U.S.C. § 3729(a)(2) claim: the fact that Defendant "made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *Allison Engine*, 553 U.S. at 671, 128 S.Ct. 2123 (quoting 31 U.S.C. § 3729(a)(2)). This false certification was designed to induce, and has induced, government payment.

■ Finally, to plead a claim under 31 U.S.C. § 3729(a)(2) in a manner that satisfies Rule 9(b), Relators must allege with particularity "that [Defendant's] false statements ultimately led the government to pay amounts it did not owe." *Hopper*, 588 F.3d at 1330. Thus, although Relators need not plead the facts surrounding presentment with particularity, they must allege that government payment of a false claim occurred. *Id.* Relators have alleged a specific example loan for Defendant where Defendant's false certifications resulted in the government's payment of amounts it did not owe, as each of these loans resulted in foreclosure. (2d Am. Compl. ¶¶ 97–116.) The foreclosure deeds Relators have submitted show that the VA became the owner of the property secured by this example loan; thus the VA clearly expended funds under the falsely obtained guarantees. Thus, Relators allege that

apply retroactively to this case. *See Hopper*, 588 F.3d at 1327 n. 3.

Defendant's false certifications resulted in the government's expenditure of funds when called upon to honor these specific guarantees. The Defendant's alleged mode of concealment of its charge for attorney's fees indeed appears particularly designed to give the semblance of regulatory compliance that it knew would be a precondition to "getting" the government's approval of VA loans and payment of the guarantee obligation upon default. Further, Relators plead statistical data suggesting that many thousands of additional loans tainted by Defendant's fraud have gone into default and the VA has suffered enormous losses as a result. (2d Am. Compl. ¶¶ 78–85.) In the current economic climate, with the default rate for IRRRL loans at 18% and skyrocketing foreclosures leading to a $25 billion national mortgage settlement with five major banks (several of whom are defendant lenders in this case), Plaintiffs' allegations in support of their claims under 31 U.S.C. § 3729(a)(2) are plausible and sufficient.

Under *Hopper*, Relators have therefore properly pled violations of 31 U.S.C. § 3729(a)(2) against Wells Fargo. 588 F.3d at 1327–29. *See also Matheny*, 671 F.3d at 1230 (relator pled a use of false document claim under the FCA with sufficient particularity to satisfy Rule 9(b) where the relator alleged "personal involvement in not only the process that lead to a false [document], but the creation of the actual [document] that was submitted"); *United States ex rel. Main v. Oak-*

*land City Univ.*, 426 F.3d 914, 916 (7th Cir.2005) ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); *United States v. Klein*, 230 F.Supp. 426, 442 (W.D.Pa.1964) ("Here it is clear that the fraudulent statement in the loan application as to the purpose of the borrowing was an essential inducement to the Federal Housing Administration guaranty upon which the government has now had to pay. Thus the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money."), *aff'd mem.*, 356 F.2d 983 (3d Cir.1966).

## C. Materiality

Defendants further argue that Relators have failed to allege a material falsehood as required under the False Claims Act.[9] (Def.'s Br. Supp. Mot. Dismiss, Doc. 232–1, at 24; *see also* First Tennessee Br. Supp. Mot. Dismiss, Doc. 226–1, at 18–21.) Defendant asserts that Relators have not adequately pled that the false certifications alleged were material to the government's decision to honor the VA loan guarantees. (Def.'s Br. Supp. Mot Dismiss, Doc. 232–1, at 24.) Defendant claims that the VA Lender Handbook establishes that the VA does not void loan guarantees based on the charging of unallowable closing costs, but rather requires lenders to refund such unauthorized costs, when discovered, to the borrower.[10] (*Id.*)

---

**9.** Defendant does not address this argument at length in its brief. However, the Court construes Defendant's position as adopting the arguments of other defendant lenders regarding materiality. The Court therefore cites to the briefs of other lenders in this section.

**10.** Defendant's attempt to avoid potential liability by pointing blame on closing attorneys for the alleged unauthorized closing costs is unavailing. First, the IRRRL program regu-

lations make participating lenders responsible for the closing costs assessed to the veteran borrower. 38 C.F.R. § 36.4313(a) ("[N]o loan shall be guaranteed or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under ... this section."). Moreover, whether Defendant lender were in fact aware of the impermissible attorney's fees concealed within title charges is clearly an

■ "To be material, a misrepresentation must have the ability to influence the government's decision-making." *Matheny*, 671 F.3d at 1228. In dealings with a government agency, a false statement is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F.Supp.2d 108, 118 (D.D.C.2007). If a representation is not material, or not capable of influencing an agency's decision to pay out on a claim, then the claim would not be false. "It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir.2003).

■ The same argument Defendant advances here was rejected by the *Fago* court on a motion for summary judgment. 518 F.Supp.2d at 118–20. There, M & T Mortgage Corporation claimed that the forged documents submitted to the Department of Housing and Urban Development ("HUD") within the required loan file were not material because they were not among the eleven documents listed in Appendix 17 to the Program Handbook that HUD would consider in deciding to insure a loan. *Id.* at 118. The *Fago* court reasoned that Appendix 17 did not give the impression that the list of documents was exclusive and the Handbook as a whole gave HUD the discretion to review additional information if it "has reason to suspect that fraud has occurred." *Id.* Further, the Court pointed out that Appendix 17 was merely a "checklist" to help lenders submit all required documentation, "not an official agency regulation promulgated pursuant to the Administrative Procedures Act." *Id.* Moreover, the governing regulations authorized HUD to consider "any

information" in determining if a loan application is fraudulent and should be denied. *Id.* Therefore, the court concluded that a genuine issue of fact existed regarding whether the forged documents were "capable of influencing" HUD's decision and denied summary judgment. *Id.* at 119–20.

Defendant here relies on a number of provisions in the VA Lender Handbook describing how the VA handles different kinds of lender misconduct to support its contention that the charging of unauthorized closing costs does not result in the VA voiding a loan guaranty. However, VA regulations adopted pursuant to the Administrative Procedures Act supersede any information in the Lender Handbook. Those regulations provide in relevant part:

> [A]ny willful and material misrepresentation or fraud by the lender, or by a holder, or the agent of either, in procuring the guaranty or the insurance credit, shall relieve the Secretary of liability, or ... shall constitute a defense against liability on account of the guaranty or insurance of the loan in respect to which the willful misrepresentation, or the fraud, is practiced.

38 C.F.R. § 36.4328(a)(1).

The VA regulations also specifically provide that a lender's certification of compliance with the IRRRL program rules regarding allowable closing costs is a *condition precedent* to the issuance of a VA loan guaranty. *See* 38 C.F.R. § 36.4313(a) ("[N]o loan shall be guaranteed or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under paragraph (d) or (e) of this section."). Based on this provision of the regulations, Defendant's certifications of compliance with the limitations on clos-

issue of fact inappropriate for resolution on a motion to dismiss.

ing costs was an essential condition to obtaining the government guaranty.

Moreover, even if the Court takes judicial notice of the contents of the Lender Handbook, the VA still maintains great discretion in how it responds to a violation of the IRRRL regulations. The Handbook provides, "If VA finds significant deficiencies in a loan submission, VA will contact the lender regarding any corrective measures needed and any impact on VA's guaranty of the loan." (Griffin Decl. Ex. F, Doc. 166–4 at 278.) When the VA determines that a lender has charged unallowable closing costs to a veteran, the Handbook recommends that a reviewing officer obtain further documentation regarding the closing costs, communicate with a lender by letter and telephone, and finally, "[r]eview the situation and actions already completed with the Chief of Loan Processing or higher authority." (*Id.* Ex. G, Doc. 166–4 at 298–99.) Moreover, the VA Servicer Guide states, "To the extent that a holder fails to comply with VA servicing requirements, regulations and/or laws applicable to the servicing and origination of VA home loans, a claim is subject to adjustment by VA." (*Id.* Ex. W, Doc. 166–4 at 617.) Like the HUD Handbook in *Fago*, the VA Handbook and Servicer Guide give the VA ultimate flexibility and discretion in responding to a lender's assessment of unauthorized closing costs.

Therefore, under the VA Handbook and Servicing Guide and, more importantly, the official VA regulations vetted through the administrative rulemaking process, Relators have pled false certifications that

could plausibly materially influence the VA's decision to honor a loan guaranty. A factual challenge to the materiality of the certifications is premature on a motion to dismiss.[11]

### D. *Donnelly Bankruptcy*
#### 1. *Real Party in Interest*

■ Wells Fargo further moves to dismiss on the basis of Relator Donnelly's Chapter 7 bankruptcy case. Defendant argues that because Donnelly failed to disclose the claims involved in this case to the Bankruptcy Court, they were never abandoned by the bankruptcy Trustee and are still property of the bankruptcy estate. Therefore, Defendant argues, Relator Donnelly lacks standing to pursue these claims. Although Defendant frames this as an issue of standing, "the issue is really about who can litigate the claim, [the debtor] or the Trustee." *Barger v. City of Cartersville,* 348 F.3d 1289, 1292 (11th Cir. 2003) (finding that a debtor met the requirements for standing, including (1) having suffered injury in fact (2) traceable to the defendant (3) that is likely to be redressed, and the relevant question was whether the debtor or trustee was the real party in interest under Rule 17(a)).

■ "Generally speaking, a pre-petition cause of action is the property of the Chapter 7 bankruptcy estate, and only the trustee in bankruptcy has standing to pursue it." *Parker v. Wendy's Int'l, Inc.,* 365 F.3d 1268, 1272 (11th Cir.2004) (citing *Barger,* 348 F.3d at 1292). The commencement of a Chapter 7 bankruptcy case cre-

---

**11.** Moreover, even if Defendant succeeds in establishing that as a factual matter, the false certification of program compliance is not material to the VA's decision to honor a loan guaranty and the VA would simply have required Defendant to refund the unauthorized closing costs at issue, Relators would still be able to show that the false certifications resulted in the government paying a claim that

was *false to the extent of the unauthorized closing costs. See United States v. Rivera,* 55 F.3d 703, 707 (1st Cir.1995) ("The claim was 'false or fraudulent' in that the amount claimed was inflated by $686,349, the amount that defendants pocketed as a result of their fraudulent scheme.") (citing *United States v. Veneziale,* 268 F.2d 504, 506 (3d Cir.1959)).

ates a bankruptcy estate and vests in the estate title to virtually all of the debtor's assets. 11 U.S.C. § 541(a)(1) (providing that the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). A cause of action belonging to the debtor as of the commencement of the bankruptcy case is property of the estate. *Id.; Parker,* 365 F.3d at 1272. Property of the estate remains in the estate unless it is disclosed and either exempted by the debtor, administered by the trustee, or abandoned by the trustee. 11 U.S.C. § 554(d); *Parker,* 365 F.3d at 1272. An asset that is never disclosed in a Chapter 7 bankruptcy case remains property of the estate even after the case is closed. 11 U.S.C. § 554(d). Therefore, for a legal claim belonging to the debtor that was not disclosed, the trustee as representative of the estate is the real party in interest entitled to pursue the claim. *Parker,* 365 F.3d at 1272; *Barger,* 348 F.3d at 1292.

At the time Relators filed the instant suit, in 2006, Relator Donnelly had not yet filed his Chapter 7 bankruptcy case. Thus, at that time, Donnelly owned his interest in this suit and was the real party in interest. However, from the moment he filed his bankruptcy case in 2008, the Chapter 7 Trustee became the real party in interest entitled to pursue the claims. *See Barger,* 348 F.3d at 1292. Rule 17(a) states that an action "must be prosecuted in the name of the real party in interest," but the Court may not dismiss an action for failure to comply with this requirement "until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed.R.Civ.P. 17(a). Although Donnelly's Chapter 7 Trustee has not been formally joined or substituted

into the action, he has ratified the action by obtaining an Order from the Bankruptcy Court authorizing Donnelly to pursue these claims on behalf of the estate. (*In re Donnelly,* Bankr.N.D. Ga., Case No. 08–23093, Doc. 34, 37.) Moreover, Rule 25(c) states that "[i]n case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom interest is transferred to be substituted in the action or joined with the original party." Fed.R.Civ.P. 25(c). Thus, since the Court has not previously directed the Chapter 7 trustee to be substituted or joined in this action, Donnelly may continue to pursue it until so ordered. *See Barger,* 348 F.3d at 1292–93.

Pursuant to the Bankruptcy Court's Order entered December 1, 2011, Donnelly is pursuing these claims on behalf of the bankruptcy estate. (*In re Donnelly,* Bankr.N.D. Ga., Case No. 08–23093, Doc. 34, 37.)[12] The Chapter 7 Trustee filed a motion to approve the settlement agreement with JPMorgan Chase on April 3, 2012, which the Bankruptcy Court approved on April 24, 2012. (*Id.* Docs. 47, 52.) The $3,510,000 to be paid to Relator Donnelly's estate pursuant to the JPMorgan settlement will exceed the amount of any claims and administrative expenses in the bankruptcy case. (*Id.* Doc. 47 at 4; Doc. 1 at 41, reflecting total liabilities of $750,251.68.) After all claims and administrative expenses of the estate are paid, Donnelly will be entitled to any funds remaining, and the closing of the bankruptcy case will revest the remaining claims with Donnelly. *See* 11 U.S.C. §§ 726(a)(6), 945(b), 554(c). Therefore, as the Trustee has ratified this suit and his interest in the case is soon to be extinguished, the Court

12. The Court takes judicial notice of these public documents filed in Relator Donnelly's bankruptcy case. *See Halmos v. Bomardier*

*Aerospace Corp.,* 404 Fed.Appx. 376, 377 (11th Cir.2010).

does not require that the Trustee be added as a party at this time. The Court further **DENIES** Defendant's motion to dismiss on this ground.

### 2. Judicial Estoppel

 Further and in the alternative, Defendant argues that Donnelly should be barred from pursuing these claims based on the doctrine of judicial estoppel. "Judicial estoppel is an equitable doctrine that precludes a party from 'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *Barger*, 348 F.3d at 1293 (citing *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 (11th Cir.2002)). The applicability of judicial estoppel turns on two factors: (1) whether the plaintiff made the inconsistent statement in a prior proceeding under oath, and (2) whether the inconsistencies were "calculated to make a mockery of the judicial system." *Id.* at 1293–94. These factors are not inflexible, and the Court should consider "all of the circumstances of a particular case" in determining whether judicial estoppel should apply. *Id.*

 It is uncontested that Relator Donnelly's prior statement to the Bankruptcy Court that he had disclosed all of his assets, when in fact he had omitted the qui tam claim at issue in this suit, was made under oath. The key question, then, is whether Donnelly's conduct reflected an intent to manipulate the judicial system. Donnelly has attested under oath that he did not disclose the qui tam case when his bankruptcy case was originally filed because he understood that the qui tam suit was then under seal and believed that no public disclosure of the suit could be made.

(Donnelly Aff. Re. Bankr. ¶¶ 3–5.) Once the seal was lifted on October 3, 2011, Donnelly moved to reopen his bankruptcy case on November 2, 2011, and promptly disclosed the qui tam claims on November 15, 2011. (*Id.* ¶¶ 6–8.) On these facts, the Court concludes that Donnelly's behavior did not evince an intent to make a mockery of the judicial system, and the doctrine of judicial estoppel should not be applied to bar his claims.[13] *See Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1346 (11th Cir.2006). Accordingly, the Court **DENIES** Defendant's motion to dismiss on the ground of judicial estoppel.

## V. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Wells Fargo's Motion to Dismiss Relators' claims [Doc. 168]. The Court **DISMISSES** Relators' claims against Wells Fargo under 31 U.S.C. § 3729(a)(1) and **DENIES** Wells Fargo's Motion to Dismiss as to Relators' claims under 31 U.S.C. § 3729(a)(2).

The parties are directed to file a consolidated preliminary scheduling and discovery plan on or before December 5, 2012.

---

**13.** Moreover, judicial estoppel does not bar the chapter 7 Trustee's interest in Donnelly's claims, as the Trustee made no false or inconsistent statement under oath. *Parker*, 365 F.3d 1268, 1273.